# United States Court of Appeals
## For the First Circuit

No. 17-1296

ALLCO RENEWABLE ENERGY LIMITED,

Plaintiff, Appellant,

v.

MASSACHUSETTS ELECTRIC COMPANY, agent of National Grid;
ANGELA M. O'CONNOR, individually and in her official capacity as
Chairperson of the DPU; JOLETTE A. WESTBROOK, individually and
in her official capacity as Commissioner of the DPU;
ROBERT HAYDEN, individually and in his official capacity as
Commissioner of the DPU; JUDITH JUDSON, individually and in her
official capacity as Commissioner of the MDER,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Thompson, and Barron,
Circuit Judges.

Eric L. Christensen, with whom Cairncross & Hempelmann, P.S.,
Thomas Melone, and Allco Renewable Energy Limited were on brief,
for appellant.
Michael Kunselman, with whom Alston & Bird LLP, Anthony J.
Marchetta, and Day Pitney LLP were on brief, for appellee
Massachusetts Electric Company d/b/a National Grid.
Timothy J. Casey, Assistant Attorney General, Government
Bureau, with whom Maura Healey, Attorney General of Massachusetts,
was on brief, for state appellees O'Connor, Westbrook, Hayden, and
Judson.

November 13, 2017

**TORRUELLA**, **Circuit Judge**. This case arises from the efforts of Allco Renewable Energy Limited ("Allco") to enforce section 210 of the Public Utility Regulatory Policies Act ("PURPA"), 16 U.S.C. § 824a-3, against Massachusetts Electric Company d/b/a National Grid ("National Grid"). The district court dismissed Allco's claim against National Grid because section 210 does not provide a private right of action against utility companies (such as National Grid). The district court was correct, so we affirm that dismissal. Allco also appeals the district court's denial of its motion for additional relief against various Massachusetts Department of Public Utilities (MDPU) officials (collectively, the "state defendants") after the district court invalidated certain MDPU regulations as inconsistent with PURPA. The district court did not abuse its discretion in doing so, so we affirm that decision as well.

## I.  BACKGROUND

### A.

We begin with an overview of the statutory scheme at the heart of this case. Congress passed PURPA in 1978 in response to the ongoing energy crisis that plagued the nation. FERC v. Mississippi, 456 U.S. 742, 745 (1982). Section 210 of PURPA seeks to lessen the United States' reliance on oil and natural gas by encouraging the development of energy-efficient cogeneration and

small power production facilities. Id. at 750. See 16 U.S.C. § 824a-3. "Cogeneration facilities capture otherwise-wasted heat and turn it into thermal energy; small power-production facilities produce energy (fewer than 80 megawatts) primarily by using 'biomass, waste, renewable resources, geothermal resources, or any combination thereof.'" Portland Gen. Elec. Co. v. FERC, 854 F.3d 692, 695 (D.C. Cir. 2017) (quoting 16 U.S.C. § 796(17)). Both of these categories of facilities are known as "qualifying facilities" ("QFs") under PURPA.

Congress found that traditional electric utilities' reluctance to transact with these nontraditional facilities posed an obstacle to facilitating their development. FERC, 456 U.S. at 750. It sought to address this by requiring utilities to do so. Thus, section 210(a) of PURPA directed the Federal Energy Regulatory Commission ("FERC") to promulgate rules mandating that electric utilities purchase energy from QFs. 16 U.S.C. § 824a-3(a). Those rules, section 210(b) specified, were not to "provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." Id. § 824a-3(b). PURPA defines "incremental cost" as "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source." Id. § 824a-3(d). In accordance

-4-

with this directive, FERC promulgated regulations requiring utilities to purchase electricity from QFs "at a rate equal to the utility's full avoided cost." Am. Paper Inst. v. Am. Elec. Power Serv. Corp., 461 U.S. 402, 405-06 (1983) (citing 18 C.F.R. 292.304(b)(2)). Crucially, given section 210's purpose, the avoided cost rate "usually exceeds the market price for wholesale power." Portland Gen., 854 F.3d at 695. Additionally, section 210(f) of PURPA instructs state regulatory authorities to implement these FERC rules. 16 U.S.C. § 824a-3(f); see also Portland Gen., 854 F.3d at 695 ("Under PURPA, state utility commissions are responsible for calculating the avoided-cost rates for utilities subject to their jurisdiction").

Key to this case is understanding PURPA's framework for enforcing its requirement that states implement FERC's PURPA-implementing rules. Sections 210(g)-(h) of PURPA create "an overlapping scheme of federal and state judicial review of state regulatory action taken pursuant to PURPA." Greenwood ex rel. Estate of Greenwood v. N.H. Pub. Utils. Comm'n, 527 F.3d 8, 10 n.1 (1st Cir. 2008). First, PURPA allows a QF to petition FERC to bring an enforcement action against a state on the grounds that the state has failed to properly implement PURPA. 16 U.S.C. § 824a-3(h). With respect to private enforcement, PURPA's enforcement scheme contemplates two types of private actions

-5-

against a state utility regulatory agency: "implementation" challenges and "as-applied" challenges. Exelon Wind 1, L.L.C. v. Nelson, 766 F.3d 380, 388 (5th Cir. 2014); Power Res. Grp., Inc., v. Pub. Util. Comm'n of Tex., 422 F.3d 231, 234-35 (5th Cir. 2005).

Implementation challenges involve claims that a state agency has failed to properly implement FERC's regulations governing the purchase of energy from QFs. Power Res. Grp., 422 F.3d at 235. As-applied challenges, meanwhile, involve claims that a utility has failed to abide by a state's regulations implementing PURPA. See Portland Gen., 854 F.3d at 698 (citing 16 U.S.C. § 824a-3(g)(2)). While federal district courts have exclusive jurisdiction over implementation challenges, only state courts may hear as-applied challenges. Id. Additionally, an individual seeking to bring an implementation challenge may only do so after having petitioned FERC to bring an implementation enforcement action, and only if FERC has not initiated an action within sixty days of receiving the petition. 16 U.S.C. § 824a-3(h)(2)(B).

Finally, and crucially, PURPA's text does not make any reference to the possibility of a QF bringing any sort of action against a utility in federal court.

On March 28, 2011, Allco offered to sell National Grid the entire generation output from eleven of its solar energy generating QFs located in Massachusetts. These QFs all have a production capacity between one and thirty megawatts. Consistent with Mass. Code Regs. § 8.03(1)(b)(2), Allco offered to negotiate a purchase agreement with National Grid. On April 18, 2011, National Grid declined to negotiate a contract with Allco, but offered instead to purchase Allco's energy under its standard power purchase contract. The methodology for arriving at the price rate in National Grid's standard contract complied with the relevant MDPU regulations governing that calculation. See 220 Mass. Code Regs. § 8.05(2)(a).

On August 3, 2011, Allco, pursuant to 220 Mass. Code Regs. § 8.03(1)(c), petitioned the MDPU to investigate the reasonableness of National Grid's response to Allco's offer. Allco further requested a declaration that National Grid was legally obligated to purchase energy from Allco's QFs for a term of twenty-five years, at the rate of its avoided costs, calculated using the rate-forecasting methodology the MDPU employed in a specific 2010 proceeding. The MDPU denied that petition on July 22, 2014, finding National Grid's offer to Allco both reasonable and consistent with its regulations.

-7-

In response, Allco petitioned the FERC to bring an enforcement action against MDPU on the grounds that MDPU's regulations clashed with PURPA. FERC declined to do so. Under PURPA, that allowed Allco to sue the MDPU. See 16 U.S.C. § 824a-3(h)(2)(B).

## c.

On October 6, 2015, Allco sued National Grid and the state defendants in the District of Massachusetts. Allco contended that the MDPU regulations at issue conflicted with FERC's regulations implementing PURPA. Specifically, it maintained that the MDPU regulations ran afoul of 18 C.F.R § 292.304(d)(2) in denying QFs the option of calculating the utility's avoided costs either "at the time of delivery" or "at the time the obligation is incurred." Allco also sought a declaration that National Grid had a "legally enforceable obligation" to buy the output of Allco's QFs for a twenty-five-year term, at the rate of National Grid's long-term avoided costs. Finally, Allco requested damages from National Grid for its lost income. National Grid moved to dismiss Allco's complaint for failure to state a claim. Allco moved for summary judgment of its claims against National Grid and the state defendants.

Meanwhile, at the district court's request, FERC filed an amicus brief. In that brief, FERC "decline[d] to provide a

definitive opinion as to the specific question of whether [MDPU's] regulations are consistent with PURPA, or with FERC's implementation of PURPA." In lieu of taking a definitive stance on any of the questions before the court, the brief only generally discussed those issues in broad terms.

The district court granted Allco's motion for summary judgment of its challenge to the MDPU's regulations. It denied Allco's motion for summary judgment of its claim for damages and declaratory relief against National Grid. Finally, it granted National Grid's motion to dismiss those claims. Specifically, the district court concluded that Allco did not have a private cause of action to enforce National Grid's obligation to purchase its QFs' output. Allco Renewable Energy Ltd. v. Mass. Elec. Co., 208 F. Supp. 3d 390, 395-97 (D. Mass. 2016). The district court then denied Allco's motions for reconsideration and additional relief against the state defendants. Allco appeals the district court's dismissal of its claims against National Grid and denial of further relief against the state defendants.

Lastly, after the district court struck down its regulations as inconsistent with PURPA, the MDPU initiated a rulemaking to satisfactorily replace those regulations.

## II.  ALLCO'S EFFORTS TO SUE NATIONAL GRID TO ENFORCE PURPA'S "MUST-BUY" OBLIGATION

Allco contends that under PURPA, National Grid has "an obligation to purchase all energy offered by Allco," and that it may sue National Grid to enforce that obligation.

As an initial matter, section 210 of PURPA expressly authorizes three types of enforcement actions: (1) implementation challenges by FERC against states in federal court, 16 U.S.C. § 824a-3(h)(2)(A); (2) implementation challenges by QFs against states in federal court, id. § 824a-3(h)(2)(B); and (3) as-applied challenges by QFs against utilities in state court, id. § 824a-3(g).  Allco contends that section 210 also implicitly allows QFs to sue utilities in federal court to enforce the must-buy obligation.

Alexander v. Sandoval, 532 U.S. 275 (2001), guides our analysis.  There, the Supreme Court held that "private rights of action to enforce federal law must be created by Congress."  Id. at 286.  When a statute does not contain an express private cause of action, courts "must interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy."  Id. (emphasis added).  Statutory intent is dispositive, and "[w]ithout it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with

-10-

the statute." Id. at 286-87. In other words "a private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred.'" Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378, 1387-88 (2015) (plurality opinion) (quoting Gonzaga Univ. v. Doe, 536 U.S. 273, 283 (2002)).

Additionally, certain factors cut against finding an implied private cause of action in a given statute, such as the existence of other express enforcement provisions. The Court in Sandoval explained that the "express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." 532 U.S. at 290. Indeed, "[s]ometimes [that] suggestion is so strong that it precludes a finding of congressional intent to create a private right of action, even though other aspects of the statute . . . suggest the contrary." Id. (citation omitted); see also Bonano v. East Caribbean Airline Corp., 365 F.3d 81, 85 (1st Cir. 2004) (holding that Congress's express provision of a solitary private right of action under the Federal Aviation Act weighed against finding additional implied rights). This is doubly so when a statute's express enforcement scheme is complex, and when agencies play a role in enforcing the statute. See Armstrong, 135 S. Ct. at 1385 (2015) ("The sheer complexity associated with enforcing § 30(A), coupled with the express provision of an administrative remedy . . . shows that the

Medicaid Act precludes private enforcement of § 30(A) in the courts.").

Allco, therefore, faces an uphill battle in asserting that section 210 implicitly provides a private right of action apart from the enforcement mechanisms it expressly contemplates. Nonetheless, Allco makes copious arguments to the effect that Congress must have intended to give QFs a right to enforce PURPA's "must-buy" obligation against utility companies. We consider its principal arguments in turn.

First, Allco points to the Supreme Court's comment in FERC v. Mississippi that states may satisfy their obligations under section 210 of PURPA, among other ways, "by resolving disputes on a case-by-case basis." 456 U.S. at 751. This language, it furthers, implicitly recognized a private right of action against utilities.

It is difficult to see how recognizing that states may resolve disputes on a case-by-case basis amounts to recognizing a private right of action against a utility in federal court. As National Grid suggests, it makes most sense to understand that language as referring to state court adjudication of as-applied challenges. In any event, this line cannot suffice to satisfy Sandoval's demand for indicia of Congressional intent to create a private right.

-12-

Second, Allco, citing Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19 (1979), argues that when Congress "addresses contract-like rights . . . it intends the customary legal incidents attendant to those rights to be available[,] including suit."  Thus, because PURPA obligates National Grid to purchase energy from Allco's QFs, Congress must have intended to give QFs the means of enforcing that contract-like obligation.  However, Transamerica's holding only addressed Congressional declarations that "certain contracts are void," in which case "the customary legal incidents of voidness would follow."  Id.  Yet, Allco avers that the Second and Ninth circuits have extended Transamerica beyond the context of voidness.  See First Pac. Bancorp, Inc. v. Helfer, 224 F.3d 1117, 1123 (9th Cir. 2000); Oneida Indian Nation v. Cty. of Oneida, 719 F.2d 525, 535 (2d Cir. 1983).

But, this argument is unavailing because no contract exists between Allco and National Grid.  Section 210 of PURPA does not create a contract.  Rather, it merely creates an obligation to enter into a contract at a regulation-specified cost rate. Here, Allco and National Grid never agreed upon a cost rate, nor has any regulation or court set that rate.  Indeed, Allco does not allege breach of contract, not could it, given that no contract exists.  Unlike in the cases Allco cites, this case does not

-13-

involve a contract or other enforceable obligation from which any "customary legal incidents" could follow.

Third, Allco highlights that section 210 of PURPA contains "rights-creating language," in addition to an intent to confer those rights on a specific class of persons. Nothing, it furthers, indicates that Congress intended to leave those rights unenforceable. However, Allco inverts the proper analysis. We don't look for indicia that Congress meant to leave rights unenforceable. Rather, a right of action only exists where Congress has clearly intended one. Sandoval, 532 U.S. at 286. Further, while rights-creating language is a necessary condition to finding a private remedy, it is alone insufficient to support an implied remedy. Bonano, 365 F.3d at 84 (citing Gonzaga, 536 U.S. at 283-84). Also relevantly, the court in Sandoval considered the case of language of this sort. It indicated that the notion that Congress typically provides an express remedy at the exclusion of all others can even overcome language "making the would-be plaintiff a member of the class for whose benefit the statute was enacted." Sandoval, 532 U.S. at 290 (internal quotation marks omitted).

Thus, Allco fails to show that Congress, by way of section 210's rights-creating language, intended to create an additional remedy to those it established expressly.

-14-

Fourth, Allco argues that the district court's failure to find a private federal cause of action against utilities places QFs with a capacity of over 30MW (which Allco's are not) in a "no man's land" where they have no remedy. Congress, it argues, could not have intended this result. Allco bases this argument on subsection 210(h)(1)'s provision that subsection 210(g)'s state court adjudication process does not apply to the "operations" of QFs that are subject to FERC jurisdiction under part II of the Federal Power Act (FPA). This includes QFs with a production capacity of greater than 30MW. 18 C.F.R. § 292.601(b).

But, as National Grid correctly highlights, subsection 210(h)(1) specifically provides that in cases of regulatory overlap between PURPA and the FPA, the challenged PURPA regulation "shall be treated as a rule under the [FPA]." As a result, the FPA's enforcement scheme would be available to QFs with a production capacity of greater than 30MW. Under the FPA, any person may file a complaint with FERC, 18 C.F.R. § 385.206(a), and FERC's decision is subject to judicial review in the D.C. Circuit, 16 U.S.C. § 825l(b). This is far from the remedy-less "no man's land" that Allco alleges. In fact, the very case that Allco relies on in making this argument describes the process by which QFs with a production capacity of greater than 30MW may obtain judicial

-15-

review of PURPA regulations that overlap with FPA regulations. See Portland Gen., 854 F.3d at 697-700.

Fifth, Allco maintains that failing to find a private remedy against National Grid leaves it stranded in another "no man's land," where it must "wait and hope that the MDPU takes some action that would be compliant with PURPA."

Allco overstates the irregularity and gravity of this situation. The district court entered its order invalidating the MDPU's regulations on September 23, 2016. In response, the MDPU commenced a rulemaking on March 21, 2017 to promulgate PURPA-compliant regulations. The MDPU sought public comment until April 28, 2017. Allco's eagerness for the MDPU to conclude this process so that it may enter into a contract with National Grid under the resulting PURPA-compliant regulations is understandable. Yet, waiting for the MDPU to promulgate those regulations does not quite amount to a "no man's land." Allco's rhetorical flourish ignores the mundane and commonplace nature of waiting for an agency to conclude a rulemaking process. Indeed, at any given moment, countless men (among others) can be found in this land of awaiting finalized agency rules. Allco's temporary visit there does not show that Congress meant to give it a private right under PURPA.

As the MDPU points out, as soon as it finishes promulgating the regulations in question, Allco is free to submit

an offer to National Grid to purchase its generation output. If the parties fail to reach an agreement within ninety days, and Allco believes that National Grid has acted unreasonably, then it may file a petition with the MDPU under 220 Mass. Code Regs. § 8.03(1)(c). Allco could then challenge any resulting adverse MDPU decision in state court. Mass. Gen. Laws ch. 25, § 5. Moreover, if Allco comes to believe that the MDPU's new rule violates PURPA, it will be able to petition FERC to bring an implementation challenge. See 16 U.S.C. § 824a-3(h)(2)(B). Should FERC decline that invitation, Allco could itself bring an implementation challenge. Id. If Allco believes that the MDPU's regulations violate PURPA as applied to its dealings with National Grid, it will be able to bring an as-applied challenge in state court.[1] Id. at § 824a-3(g).

In other words, the "no man's land" in which Allco purports to find itself is illusory. And again, even were it not, that would still fall well short of showing that Congress unequivocally conferred upon QFs a private right of action against utilities to enforce PURPA's must-buy provision.

---

[1] Additionally, to the extent that Allco accuses the MDPU of sitting on its hands or otherwise not acting with sufficient diligence in promulgating the regulations in question, the proper remedy would still not be to sue National Grid.

Allco's last set of arguments all involve the FPA. In brief, Allco maintains that it enjoys a private right of action both under section 210(h)(1) of PURPA -- which, it says, makes the must-buy obligation privately enforceable as a rule under the FPA -- and independently under sections 205-06 of the FPA, 16 U.S.C. §§ 824d, 824e.

Section 210(h)(1) of PURPA provides that:

> For purposes of enforcement of any rule prescribed by the Commission under subsection (a) of this section with respect to any operations of an electric utility [or a QF] which are subject to the jurisdiction of the Commission under part II of the Federal Power Act, such rule shall be treated as a rule under the Federal Power Act. Nothing in subsection (g) of this section shall apply to so much of the operations of an electric utility, a qualifying cogeneration facility or a qualifying small power production facility as are subject to the jurisdiction of the Commission under part II of the Federal Power Act.

16 U.S.C. § 824a-3(h)(1) (citations omitted). Subsection (h)(1) therefore accomplishes two things. First, it channels FERC's enforcement of a certain subset of rules that it has promulgated pursuant to PURPA -- specifically, those pertaining to QF operations subject to FERC's jurisdiction under part II of the Federal Power Act -- into the FPA's enforcement scheme. See Portland Gen., 854 F.3d at 699. Second, subsection (h)(1) also prevents QFs from bringing as-applied challenges involving FERC rules of that sort.

Part II of the FPA pertains only to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce."  16 U.S.C. § 824(b)(1); see also Portland Gen., 854 F.3d at 697.  Even if we assume that FERC's rules regarding the must-buy obligation are rules regarding the operations of QFs subject to part II of the FPA, that would only make those rules enforceable as rules under the FPA.  The question would then become whether the FPA gives Allco a private right of action to enforce those rules against National Grid.  Accordingly, this argument collapses into Allco's separate contention that the FPA independently gives it a right to enforce PURPA's must-buy obligation against National Grid.  We thus need not reach Allco's argument that its potential sales to National Grid would be subject to regulatory overlap with the FPA because, even assuming that were correct, its contention that the FPA would provide it with a private right of action against National Grid fails.

Turning to that argument that the FPA allows Allco to sue National Grid, we first note that the FPA's text does not explicitly confer a private right of action.  See 16 U.S.C. §§ 824d, 824e.  Furthermore, we see nothing in that text indicating that Congress meant to confer such a right, much less unambiguously.  We also note that Allco does not cite any cases

-19-

holding that the FPA contains a private right against a utility. The same is true of the FPA's sister statute, the Natural Gas Act (NGA), 15 U.S.C. § 717 et seq., which courts interpret in parallel to the FPA, Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577 n.7 (1981) (noting that because the FPA and the NGA "are in all material respects substantially identical," the Supreme Court has developed an "established practice of citing interchangeably decisions interpreting the pertinent sections of the two statutes" (quoting FPC v. Sierra Pac. Power Co., 350 U.S. 348, 353 (1956))).

Moreover, a number of courts have concluded that the NGA does not contain such a right. See Great Lakes Gas Transmission Ltd. P'ship v. Essar Steel Minn. LLC, 843 F.3d 325, 329-30 (8th Cir. 2016); Columbia Gas Transmission, LLC v. Singh, 707 F.3d 583, 587 (6th Cir. 2013); Clark v. Gulf Oil Corp., 570 F.2d 1138, 1150 (3d Cir. 1977). We agree with them, and thus conclude that the FPA does not provide a private right either. We are especially comfortable with this conclusion given the elaborate framework for FERC enforcement that section 206 of the FPA does expressly set out. See 16 U.S.C. §§ 824m-p. Therefore, because the FPA resoundingly does not confer a private right, it is of no help to Allco in its search for a private right to enforce PURPA's must-buy obligation against National Grid.

To wrap up, none of Allco's arguments about PURPA overcome two fundamental truths about that statute: (1) its text does not expressly provide for private enforcement of that sort; and (2) its text does expressly provide for an intricate enforcement framework, involving both FERC and private litigants, in state and federal court. Allco's assertion that the FPA gives it a private right against National Grid is similarly unavailing. The district court therefore correctly granted National Grid's motion to dismiss because PURPA does not give Allco a private right of action against National Grid.

## III. ALLCO'S EFFORTS TO OBTAIN ADDITIONAL RELIEF AGAINST THE STATE DEFENDANTS

We now consider Allco's contention that the district court should have gone beyond simply invalidating the MDPU's regulations, and calculated National Grid's avoided costs. "Judgment calls, including the lower court's choice of equitable remedies, are afforded substantial deference and will be disturbed only if the court has made a significantly mistaken judgment." Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Municipality of San Juan, 773 F.3d 1, 7 (1st Cir. 2014) (citing Rosario-Torres v. Hernández-Colón, 889 F.2d 314, 323 (1st Cir. 1989) (en banc)).

The state defendants argue that we lack jurisdiction to decide this issue because Allco seeks to challenge a judgment that was in its favorable. However, Allco is not merely trying to

procure appellate review of statements or findings contained in a judgment in its favor, as was true in the case on which the state defendants rely. See Elkin v. Metro. Prop. & Cas. Ins. Co. (In re Shkolnikov), 470 F.3d 22, 24 (1st Cir. 2006). Rather, Allco seeks review of what it alleges was an adverse judgment with respect to the relief granted, and it specifically appeals not only from the final judgment below, but also from the district court's order denying further relief.

Allco argues that the district court, in addition to invalidating the MDPU's regulations, should have itself undertaken calculating National Grid's avoided cost rate. It highlights that PURPA authorizes district courts hearing implementation challenges to "issue such injunctive or other relief as may be appropriate." 16 U.S.C. § 824a-3(h)(2)(B). Arriving at that calculation, Allco contends, is no different than calculating damages that require forecasts, something courts regularly do. Were the district court nonetheless reluctant to do so itself, says Allco, it should have appointed a special master for the task, or passed the question to FERC pursuant to primary jurisdiction doctrine.

The district court, in declining to "engage in fact-finding to determine the proper avoided cost rate," observed that "[n]othing in the statutory scheme provides this Court with rate-making authority, and it lacks the expertise to do so." Allco

<u>Renewable Energy Ltd.</u>, 208 F. Supp. 3d at 401 (D. Mass. 2016). "Rather," it added, "the MDPU has the statutory authority to revisit its implementation of FERC's rules, either through a new rulemaking, a case-by-case adjudication, or other reasonable method." <u>Id.</u> The district court is correct. Because section 210 of PURPA generally contemplates state agencies implementing FERC's rules for determining avoided cost rates, 16 U.S.C. § 824a-3(b), (f), the district court certainly did not abuse its discretion in leaving that calculation to the MDPU.

Nor does the primary jurisdiction doctrine provide any indication that the district court abused its discretion. "The doctrine of primary jurisdiction is a prudential doctrine developed by the federal courts to promote accurate decisionmaking and regulatory consistency in areas of agency expertise." <u>Ass'n of Int'l Auto. Mfrs., Inc.</u> v. <u>Mass. Dep't of Envtl. Prot.</u>, 196 F.3d 302, 304 (1st Cir. 1999). Under that doctrine, if a court determines that an issue falls within the primary jurisdiction of an agency, the court may refer the issue to that agency and defer any decision until the agency has come to a conclusion. <u>Id.</u> We have also remarked that when it would otherwise be appropriate to stay proceedings and submit a question to an agency, requesting an amicus brief from that agency may represent a "more efficient and

expeditious alternative." Distrigas of Mass. Corp. v. Bos. Gas Co., 693 F.2d 1113, 1119 (1st Cir. 1982).

Here, given that state agencies, not FERC, are responsible for implementing FERC's rules with respect to determining specific avoided cost rates, it is far from clear that this question falls within FERC's "primary jurisdiction" to begin with. Even setting that aside, it is significant that the district court solicited an amicus brief from FERC, and that in that amicus brief, FERC declined to provide a specific contract rate. This further cements our conclusion that the district court did not abuse its discretion in limiting itself to invalidating the MDPU regulations at issue.

## IV. CONCLUSION

Allco fails to show that the district court erred in dismissing its claims against National Grid, because it lacks a private right against National Grid. So too does Allco fail to show that the district court abused its discretion in limiting the relief it granted against the state defendants. Accordingly, we affirm.

**Affirmed.**