Filed 7/30/25  Winding Creek Solar v. Pacific Gas & Electric Co. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| WINDING CREEK SOLAR LLC., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> PACIFIC GAS AND ELECTRIC COMPANY, <br><br> Defendant and Respondent. | A168649 <br><br> (San Francisco City & County Super. Ct. No. CGC-22-600746) |

Federal and state law permit small scale generators of electricity to sell electricity to larger utilities.  Here, a group of those small generators failed to have their proffered contracts accepted by a larger utility and sued the larger, seeking a mandatory injunction compelling the larger to execute the pending proffered agreements and damages of lost profits for the contracts not signed. The trial court sustained a demurrer without leave to amend, on the ground it lacked jurisdiction because the controversy lay within the exclusive authority of the Public Utilities Commission, and entered judgment for defendant.  We conclude the trial court's reasoning was eminently sound, and we affirm.

1

# BACKGROUND

**The General Setting**

In California, the generation, sale, distribution, and pricing of electricity is covered by a jungle of dense federal and state regulation. The controversy before us is a particular thicket within that jungle.

At the federal level, it has been declared policy for almost a half century to encourage native alternatives to the burning of foreign fossil fuel, a policy that is codified in the Public Utilities Regulatory Policies Act (16 U.S.C. § 2601 et seq. (PURPA).) One of the means selected to achieve that goal is to require large electricity producers to purchase electricity from smaller producers, known generically as "qualified facilities," or QFs. (See *Southern Cal. Edison Co. v. Public Utilities Com.* (2010) 101 Cal.App.4th 384, 387—388 and authorities cited.) The governing state regulatory agencies are to implement this directive, and they have considerable discretion to do so. That discretion includes fixing the requirements for valid QF-generated electricity long-term purchase agreements, and establishing " 'alternative programs that . . . limit how many QFs, or the total capacity of QFs, that may participate in the program.' " (*Winding Creek Solar LLC* v. *Peterman* (9th Cir. 2019) 932 F.3d 861, 865, quoting *Winding Creek Solar LLC* (2015) 151 F.E.R.C. 61103, 61103.)

In California, the responsible regulatory agency is the Public Utilities Commission (PUC). It has responded to this obligation by first adopting what was known as the FiT program (in effect from 2007 to 2013), then replacing it with the ReMat program (effective from 2013 to 2020), and then with the Modified ReMat program starting in 2020.

Since 2013, various QF entities operating numerous power generating facilities have been demanding that PG&E buy their electricity—to no avail. And in July 2022, nine years later, seven of the entities commenced this action against PG&E.

There was some litigation in the years before this lawsuit was filed, including one case that began in July 2013, with an administrative complaint with the PUC that demanded the PUC require PG&E to enter into 20-year contracts for 57 facilities—the same 57 facilities involved here—under PG&E E-PWF Tariff ("the PUC Action"). In May, 2014, the PUC dismissed the administrative complaint "with prejudice," explaining among other things that the law required implementation by the PUC, which PUC accomplished through the ReMAT program; that PG&E "was required to follow [the PUC's] direction before amending or replacing its Schedule E-PWF tariff to remove the public water or wastewater agency eligibility requirements"; and that "By complying with its existing tariff," "PG&E complied with the law."

In November 2014, the PUC denied rehearing, again concluding that "it was proper for PG&E to reject the rehearing applicants' tariff requests pursuant to Schedule E-PWF." The complainants then filed a petition for a writ of review in this court, which Division Three denied on March 5, 2015.

Seven years later this lawsuit was filed.

**The Proceedings Below**

On July 15, 2022, represented by two attorneys in Connecticut identifying themselves as "ALLCO RENEWABLE ENERGY LIMITED" ,

seven of the entities filed a complaint against PG&E.[1] The complaint is a most interesting filing, stating on its first page that it is a complaint for: (1) Declaratory Relief; (2) Injunctive Relief; (3) Breach of Legally Enforceable Obligation; and (4) Breach of Federal and State Laws Regulating Trade. Despite that description, a fair reading of the complaint reveals that it in fact asserts two causes of action: the first is a "claim for injunctive relief," "requiring PG&E to enter into contracts for the purchase of energy and capacity from the Plaintiffs' facilities or similar alternate facilities at the same terms and prices in effect at the time . . . when Plaintiffs submitted their applications to PG&E under" the FiT program in 2013. The second, pleaded in the alternative, seeks "the amount of profits [Plaintiffs] would have received had PG&E executed the contacts in 2013" under the FiT program.[2]

The gist of the complaint, viewed according to the principles governing review of demurrers (see *O'Grady v. Merchant Exchange Productions, Inc.* (2019) 41 Cal.App.5th 771, 776—777), and disregarding the boilerplate verbiage, can be distilled to the following:

---

[1] The plaintiffs are Winding Creek Solar LLC, Foothill Solar LLC, Hollister Solar LLC, Kettleman Solar LLC, Vintner Solar LLC, Bear Creek Solar LLC, and Allco Renewable Energy Limited.

The briefing here represents that "Allco Finance Limited LLC has an ownership interest in more than 10 percent in each of these Appellants."

[2] The complaint also pled alternative relief under ReMAT for Winding Creek only. Winding Creek, which owns a single facility out of the 57, alleges that " '[l]ater in 2013,' " it " 'submitted the standard form documentation for . . . the ReMAT,' " and seeks injunctive relief or damages under ReMAT in the alternative to the FiT program.

4

Since 2013, plaintiffs have "offered to sell the energy and capacity for a 20-year term from various generating facilities to PG&E," with the appropriate documentation, but PG&E "wrongfully refused and has continued to refuse" "to execute written contracts evidencing its obligation to purchase the energy and capacity from those facilities." Those refusals constituted a "continued repudiation" of PG&E's "obligation to purchase" plaintiffs' "energy and capacity," and were wrongful because PG&E was "obligated by federal and state law to purchase the Plaintiffs' energy." "Thus PG&E breached and continues to breach the obligation imposed on it" by Public Utilities Code section 399.20, thereby entitling plaintiffs "either to injunctive relief requiring PG&E to execute the relevant contracts or damages for Plaintiffs' lost profits."

PG&E filed a demurer that contended the complaint failed on three separate, and independent, bases: (1) the superior court lacked jurisdiction over the action; (2) the action is barred by res judicata; and (3) the action is barred by all possibly applicable statutes of limitations.

Plaintiffs filed opposition, PG&E a reply, and the matter came on for hearing on May 16, 2023, before the Honorable Richard Ulmer who, after a hearing filed his order sustaining the demurrer without leave to amend. The order sets out a comprehensive and persuasive analysis and with minor editorial, non-substantive modifications, it merits quotation virtually in full. Thus:

"Under section 1759, subdivision (a) of the Public Utilities Code, '[n]o court of this state, except the Supreme Court and the court of appeal, . . . shall have jurisdiction to review, reverse, correct, or annul any order or decision of the [Public Utilities Commission (PUC)] or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the

[PUC] in the performance of its official duties . . . .'  The [PUC] has 'exclusive jurisdiction over the regulation and control of utilities and that jurisdiction, once assumed, cannot be hampered or second-guessed by a superior court action addressing the same issue.'  (*Anchor Lighting v. S. Cal. Edison Co.* (2006) 142 Cal.App.4th 541, 548.)  The jurisdictional bar applies if the following questions are answered in the affirmative:  '(1) whether the [PUC] has authority to adopt regulatory policy on the issue in question; (2) whether the [PUC] has exercised that regulatory authority; and (3) whether the superior court action would hinder or interfere with the [PUC's] exercise of that regulatory authority.'  (*Goncharov v. Uber Technologies, Inc.* (2018) 19 Cal.App.5th 1157, 1170.)

"In this case, the CPUC has authority to adopt regulatory policy on the terms of energy purchases under PURPA (Public Utilities Regulatory Policies Act) and Public Utilities Code sec. 399.20.  The [PUC] 'is charged with implementing PURPA in California.'  (*Southern California Edison Co. v. Public Utilities Com.* (2002) 101 Cal.App.4th 384, 388; 16 U.S.C. [§] 824a-3[, subd.] (f).)

"The [PUC] has actively and continuously exercised its authority to regulate qualified facility procurement under PURPA and section 399.20. The [PUC] 'has a long history of implementing PURPA over nearly four decades . . . .'  The [PUC] enacted the Fit, ReMat, and Modified ReMat programs to discharge its PURPA obligations.  *Winding Creek Solar LLC v. Peevey*, 293 F.Supp.3d 980, U.S.Dist.LEXIS 201893 (N.D. Cal. Dec. 6, 2017) (Donato, J.) aff'd, *Winding Creek Solar LLC v. Peterman, supra*, 932 F.3d at p. 892 ['To regulate the terms under which electric utilities purchase power from QFs, the . . . [PUC] established the Renewable Market Adjusting Tariff ("Re-MAT") program.'].)

"Granting the requested injunctive relief would interfere with the [PUC's] exercise of its regulatory authority and its prior decisions. Under the third above-cited prong, section 1759 bars superior court lawsuits against public utilities 'not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would "reverse, correct, or annul" that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would "hinder" or "frustrate" or "interfere with" or "obstruct" that policy.' (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 918 (*Covalt*).) '[W]hen the relief sought would have interfered with a broad and continuing supervisory or regulatory program of the commission, the courts have found such a hindrance and barred the action under section 1759.' (*Covalt,* 13 Cal.4th at p. 919.)

"Plaintiff seeks to have contracts enacted whether or not they comply with the [PUC's] current, ongoing qualified facility procurement program. ' "The PUC has exclusive jurisdiction over the regulation and control of utilities, and once it has assumed jurisdiction, it cannot be hampered, interfered with, or second-guessed by a concurrent superior court action addressing the same issue." ' (*Id.* at 918, fn. 20, italics omitted; see also *Anchor Lighting v. S. Cal. Edison Co.* (2006) 142 Cal.App.4th 541, 544—547 [no jurisdiction where plaintiffs sought to require utility to provide discount on terms different from PUC-approved plan]; *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 278 ['A court injunction, predicated on a contrary finding of utility noncompliance, would clearly conflict with the PUC's decision and interfere with its regulatory functions in determining the need to establish prospective remedial programs.'].)

"Defendant [PG&E's] demurrer to the . . . cause of action for damages is also sustained without leave to amend because the court lacks jurisdiction under the Public Utilities Code sec. 1759.

"As explained above, the [PUC] has authority to adopt regulatory policy on the terms of energy purchases under PURPA and has actively exercised that regulatory authority.  Whether plaintiffs' damages claim would hinder or interfere with the [PUC's] exercise of that regulatory authority presents a close case.  Plaintiffs rely on *Hartwell* to contend that claim can proceed. There, the California Supreme Court ruled that while the trial court lacked jurisdiction over most of the plaintiff's claims per section 1759, some damages claims could proceed.

"*Hartwell* supports defendant, however.  In *Hartwell*, the plaintiff was allowed to pursue a damages claim based on the theory that water failed to meet federal and state drinking water standards.  The court noted that the [PUC] made a retrospective finding that the regulated utilities investigated had substantially complied with Department of Health Services drinking water standards for the past 25 years.  But 'that factual finding was not part of an identifiable "broad and continuing supervisory or regulatory program of the commission." ' (*Hartwell*, 27 Cal.4th at p. 276.)  The [PUC] recognized that the finding was merely part of the information gathering process and was not part of the rulemaking or enforcement scheme.

"In this case, plaintiffs seek to recover damages because a federal court determined that PURPA preempted certain PUC orders.  Plaintiffs' action directly contravenes the [PUC's] prior order that [PG&E] was not required to enter into FiT contracts and that Winding Creek was not entitled to obtain a contract under the suspended ReMAT program.  '[T]he superior court is precluded from deciding issues which must necessarily be decided by the

8

PUC in its continuing exercise of jurisdiction . . . .' (*Schell v. Southern Cal. Edison Co.* (1988) 204 Cal.App.3d 1039, 1046; *id.* at p. 1047 ['Even if the PUC makes an invalid order, it is binding and conclusive until annulled by the Supreme Court . . . .'].)

"'In short, an award of damages is barred by section 1759 if it would be contrary to a policy adopted by the PUC and would interfere with its regulation of public utilities.' (*Hartwell*, 27 Cal.4th at p. 275; see also *Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 10—12 [damage action for negligence in providing telephone service conflicted with PUC-approved tariff limiting telephone customer to credit allowance for improper service].)

"In *Truconnect Communications, Inc v. Maximus, Inc.* [(2023) 91 Cal.App.5th 497,] the Court of Appeal held that section 1759 did nor bar an action for damages against a defendant who allegedly negligently rolled out a telephone service plan. There, the court noted that 'the [PUC] has never made any determinations about the qualifications of rejected applicants.' (*Id.* at p. 511.) Here, even though a court action focusing on past wrongdoing does not necessarily interfere with the [PUC's] ongoing regulatory obligations, plaintiff is seeking relief that conflicts with the [PUC's] prior determinations.

"Under PURPA, claims against a utility may be brought in an 'appropriate State court,' and any such 'action in a State court shall be pursuant to any applicable State procedures.' (16 U.S.C. [§§][ 824a-3[, subd.] (g)(2), 2633[, subd.] (c)(1).) Plaintiffs therefore should not have filed this action in superior court per Public Utilities Code sec. 1759."

Judgment was entered for PG&E dismissing the action, from which plaintiffs filed a timely appeal.

## DISCUSSION

### Introduction

Now represented by one of the two Connecticut attorneys who represented them below, Plaintiffs have filed an opening brief that does not comply with the California Rules of Court, beginning with rule 8.204(a)(2)(C) that provides that an appellant's opening brief shall "[p]rovide a summary of the significant facts . . . ." The leading California appellate practice guide instructs about this: "Before addressing the legal issues, your brief should accurately and fairly state the critical facts . . . free of bias; and likewise as to the applicable law. [¶] Misstatements, misrepresentations, and/or material omissions of the relevant facts of law can instantly 'undo' an otherwise effective brief, waiving issues and arguments; it will certainly case doubt on your credibility, may draw sanctions [citation], and may well cause you to lose the case." (Eisenberg, et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2024) ¶ 9:27, p. 5, italics omitted.)

Plaintiffs' brief does not measure up.

As noted, PG&E's demurrer asserted three separate bases why the complaint failed: lack of subject matter jurisdiction, res judicata, and statute of limitations. But one reading Plaintiffs' brief would never know that, as the brief barely acknowledges that the case arises on demurrer, let alone sets forth what the trial court did. Bad enough.

Worse, plaintiffs' claimed standard of review flatly misstates the standard, their statement ending with this: "In order to prevail on appeal from an order sustaining a demurrer, the appellant must affirmatively demonstrate error. Specifically, the appellant must show that the facts pleaded are sufficient to . . . overcome the legal ground on which the trial

10

court sustained the demurrer." (*Scott v. JP Morgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 743, 752.) That is very wrong.

Had plaintiffs read the next sentence in *Scott*, they would have seen that our colleagues ended their statement of the standard of review with the well settled principle that "We will affirm the ruling if there is any ground on which the demurrer could have properly sustained." (*Scott, supra,* 214 Cal.App.4th at p. 752.) And that brings into play other well-settled law, including that an appellant has the burden to address in the opening brief *each* ground for a demurrer argued in the trial court, not just the ground or grounds relied upon by the trial court, and that a reviewing court could deem the appellant to have waived all alternative grounds by failing to address them in its opening brief.

*Tukes v. Richard* (2022) 81 Cal.App.5th 1 is instructive. Itself an appeal from a motion granting judgment on the pleadings, *Tukes* notes that the principles it discusses have been applied in demurrer cases, going on with this comprehensive discussion of the law:

"First, one challenging a judgment after demurrer or on a motion for judgement on the pleadings bears the burden to demonstrate reversible error. (*Berman v. HSBC Bank, USA, N.A.* (2017) 11 Cal.App.5th 465, 471.) Since showing merely that the trial court sustained a motion for judgment on the pleadings for the wrong *reason* is insufficient to show reversible error (*Stevenson Real* [*Estate Servies Inc. v. CB Richard Ellis Real Estate* (2006) 138 Cal.App.4th 1215,] 1220), an appellant must address in its opening brief each ground argued to the trial court in support of the motion. (*Cf. Weaver v. Shell Oil Co.* (1933) 129 Cal.App.232, 234 ['[T]he burden is upon appellants to show error in the ruling. In other words, it is incumbent upon appellants to overcome the presumption in favor of the order and this cannot be done by

11

merely giving consideration to some of the grounds upon which the motion was based'].)  Failure to meet that burden in an opening brief may result in waiver or forfeiture.  (*Berman, supra,* 11 Cal.App.5th at p. 471; cf. *Hastaran v. Marchand* (1913) 23 Cal.App.126, 134 ['[E]very point relied upon for a reversal should [be] stated and argued in the opening brief or counsel for the appellant; and therefore points not so stated and argued may be deemed to be waived'].)  However, 'the rule that legal arguments made in the trial court but not addressed in an opening brief are forfeited is a discretionary one, and we may consider the merits of the arguments.'  (*Barriga v. 99 Cents Only Stores LLC* (2020) 51 Cal.App.5th 299, 321)."  (*Tukes, supra,* 81 Cal.App.5th at p. 20.)

PG&E calls out plaintiffs on this, and their reply brief does address the issues, though not in a very comprehensive way.  We nevertheless exercise our discretion to not hold this against Plaintiffs and thus address the merits of their argument—and conclude there are none.

**The Demurrer was Properly Sustained**

In their briefs, plaintiffs make no real effort to grapple with Judge Ulmer's reasoning and demonstrate why it is erroneous.  Instead, they leap over it with a theory that is almost breathtaking in its boldness.  For plaintiffs, PURPA decreed that all utilities were required to accept any contract for electricity proffered by a QF and, according to plaintiffs, only the Federal Energy Regulatory Authority (FERC) has authority "to promulgate regulations to promote energy purchases from cogeneration and small power production facilities like the Appellants' facilities at issue in this case."  The role given to the PUC was simply to implement congressional policy.  That role is virtually ministerial, the PUC having no power to modify or dilute Congress's decision in the guise of administering it.  When the PUC

12

attempted to do so, it was exceeding its proper role, and thus no longer exercising a *regulatory* function, hence the *Covalt* standard is inapplicable. The consequence is that PURPA authorizes plaintiffs to apply for damages and injunctive relief in the superior court, where it could enjoy its constitutional right to trial by jury.  In short, "PURPA creates an original *cause of action* in a state court, not in a state agency to which there may or may not be a mandatory *de novo* appeal and where there is no right to a jury trial."

It is entirely natural that plaintiffs build their arguments around the provision in PURPA (16 U.S.C. § 1824a-3, subd. (a)) that appears to direct utilities like PG&E to purchase electricity from QFs without qualification.  It is in fact commonly referred to as the "must take" obligation.  (See, e.g., *Winding Creek Solar LLC v. Peterman*, *supra*, 932 F.3d at p. 892.)  But while the existence of the provision is undeniable, that does not mean it stands by itself without qualification—or that it is self-executing.

It would be a mistake to imagine that a utility-QF agreement is the product of the negotiations attending any other type of contract.  First, an entity cannot simply declare itself a QF and put an end to it:  the entity must meet the PURPA statutory standard (16 U.S.C. § 796, subd. (17)(C)) and FERC guidelines (18 C.F.R. § 292.203) and then be accepted as a QF.  And accepted by whom?  By the PUC.  (Cf. *Winding Creek Solar LLC v. Peterman*, *supra*, 932 F.3d at p. 865 [293 F.Supp.3d 980][" '[A]s long as a state provides QFs the opportunity to enter into long-term legally enforceable obligations . . . , a state may also have alternative programs that limit how many QFs' " and electric utilities may agree to participate in; such alternative programs may also limit how many QFs that may " 'participate in the [alternative] program' "]; *West Penn. Power Co.* (1995) 71 FERC 61,153, 61,495 [1995 WL

13

265,343 at *p.13] ["It is up to the States, not this Commission, to determine the specific parameters of individual QF power purchase agreements."].).

And unlike the ordinary buyer and seller, the parties do not set the price to be paid by the utility for a QF's electricity. Who does? The PUC, according to a tariff it has approved. Indeed, the agreement itself is to be memorialized in a form contract—FiT, ReMAT, or Modified ReMAT—promulgated by the PUC, a fact plaintiffs appear to concede, however grudgingly. Even the parties' offer and acceptance are conditioned on PUC approval. In short, the PUC is an indispensable actor, and it stands athwart the entire process, involved at every stage. If the PUC can fix prices, it can hardly be deemed to be merely and solely a ministerial agent.

Unlike plaintiffs, PURPA very clearly does not treat state utility regulatory agencies as ministerial actors. On the contrary, they are not only vested with what would be the primary enforcement of PURPA (see 16 U.S.C. § 824-3, subd. (f)(1)), but the FERC recognizes the PUC as having "a wide degree of latitude in establishing an implementation plan" for QF participation. (*California Public Utilities Commission* v. *Southern California Edison Company et al.* (2020) 133 FERC 61059, 61,266 [2010 WL 4144227 at *p.7].)

The FERC went on to say that "the determinations that a state commission makes to implement the rate provisions of . . . PURPA are by their nature fact-specific and include consideration of many factors, and we are reluctant to second-guess the state commission's determinations; our regulations thus provide state commissions with guidelines on factors to be taken into account, 'to the extent practicable,' . . . ." (*Ibid.*, fn. omitted.)

Moreover, as shown by Judge Ulmer's order and the record, the PUC has been in the thick of that process from the beginning—as plaintiffs well

14

know.  According to their complaint, plaintiffs have been trying to get QF agreements with PG&E since 2013.  Indeed, that same year, the lead plaintiff, Winding Creek Solar LLC, even successfully sued the PUC in federal court about how the QF program was being administered.

It is instructive that both the district and the circuit court rebuffed Winding Solar's request effort to enforce a never executed contract, the latter stating:  "[T]he district court did not abuse its broad discretion to fashion equitable relief by declining to grant Winding Creek a contract with PG&E . . . .  Indeed, it would be inappropriate to order a non-party to contract with Winding Creek under a modified version of the very program the court had just determined to be [incompatible with] federal regulation."  (*Winding Creek Solar LLC v. Peterman*, *supra*, 932 F.3d at p. 866.)

Nevertheless, that is still what plaintiffs are seeking in the present litigation with their claim that they are entitled to "damages in the amount of profits they would have received had PG&E executed the contracts *in 2013*."  (Emphasis added.)  The absurdity of plaintiffs getting profits from electricity never delivered is too obvious to bear scrutiny.

Even more telling is that once the federal litigation was concluded, plaintiffs did not go into state court, but went back before the PUC.

It is therefore no burden to demonstrate that the setting here easily satisfies the three-part standard formulated by our Supreme Court in *Covalt*.  Has the PUC authority to adopt regulatory policy?  Obviously, ever since Congress tapped the PUC on its shoulder and gave it that authority.  Has the PUC exercised that authority?  Also obviously, in addition to the responsibility for the purely Californian counterparts codified in Public Utilities Code section 399.20.  That the FERC retains a supervisory oversight does not, as plaintiffs believe, demonstrate that the PUC is a mere puppet,

15

with no independent potency, because our Supreme Court has held that partial or shared authority will suffice. (*Gantner v. PG&E Corp.* (2023) 15 Cal.5th 396, 414; see also *Davis v. Southern California Edison Co.* (2015) 236 Cal.App.4th 619, 642; *Anchor Lighting v. Southern California Edison Co.*, *supra*, 142 Cal.App.4th at p. 549.) Finally, permitting plaintiffs' superior court action would hinder or interfere with the PUC's exercise of that regulatory authority. As evidenced by their complaint, plaintiffs' approach to this process was to ignore the PUC and go around it, after having spent several years being a full participant in that process.

Instead, they sue a party who has never been alleged to have been disciplined or sanctioned by the PUC for violating a PUC order or directive. On the contrary, plaintiffs filed a complaint against PG&E for refusing to execute plaintiffs' proffered contracts, which the PUC rejected. Plaintiffs then complied with Public Utilities Code section 1759 by petitioning for a writ of review, which Division Three of this Court summarily denied. (*Winding Creek Solar LLC et al v. Cal. Pub. Utilities Com.* (March 4, 2015, A143797 [nonpub. order])—a fact plaintiffs do not mention in their opening brief.

Moreover, plaintiffs then sue that party for lost profits on those contracts that were never executed or performed, contracts the PUC has refused to approve. PG&E would be placed in an impossible situation, whip-sawed whichever way it was forced to turn. Even if plaintiffs were ultimately unable to prevail should this litigation proceed, their example might induce other QFs to follow. It would be hard to imagine a result more likely to produce regulatory chaos.

In short, plaintiffs have accepted PUC jurisdiction. They may even be said to have consented to it. Having done so, they will not now be heard to

16

say that PUC jurisdiction was *never* proper.  It follows that the superior court was entirely correct in ordering the dispute back to the PUC.

## DISPOSITION

The judgment of dismissal is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A168649N)